## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STANFORD B. HOOKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL AERONAUTICS AND | ) | Civil No. ELH-13-2552 |
| SPACE ADMINISTRATION (NASA), | ) | |
| an Agency of the United States; | ) | |
| Charles F. Bolden, Jr., Administrator | ) | |
| of NASA, in his official capacity, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS,
## OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

In his Complaint, Plaintiff Stanford B. Hooker alleges that Defendant, National

Aeronautics and Space Administration (NASA or Defendant) failed to comply with the Privacy

Act of 1974, 5 U.S.C. § 552a, when it investigated his alleged workplace misconduct that

culminated in his receipt of a disciplinary action in the form of a three-day, unpaid suspension.

The essence of Plaintiff's claim is that, in conducting its investigation, NASA failed to collect

information from him to "the greatest extent practicable." *See* ECF-1, Complaint at ¶¶ 76-78.

Plaintiff seeks relief under 5 U.S.C. § 552a(g)(1)(D) based on NASA's alleged failure to comply

with the Act "in such a way as to have an adverse effect" on him. *Id*. at ¶ 76. He asserts that

NASA was required to obtain information from him first before interviewing other witnesses.

*Id*. Plaintiff also claims that NASA maintained "secret records" about its investigation and that

he was not given the opportunity to challenge their accuracy. *Id*. at ¶ 79. Through this lawsuit,

Plaintiff seeks a "clean record," back pay, benefits, and interest, as well as a voiding of his three-

day disciplinary suspension, and reversal of other corrective personnel actions imposed by Defendant. *Id.* at p. 52.

As explained herein, Plaintiff's lawsuit should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. Alternatively, as there is no genuine dispute of material fact, the Court may dismiss this lawsuit as a matter of law pursuant to Fed. R. Civ. P. 56. Plaintiff has conceded that the Privacy Act does not provide the injunctive and declaratory relief he seeks in this lawsuit. Moreover, Plaintiff is unable to establish that Defendant violated the Privacy Act in the manner it conducted its investigation and reached its decisions. His claim of NASA's maintenance of "secret records" is belied by his own Complaint which indicates that he possesses a copy of the records he claims to be secret. Finally, Plaintiff's lawsuit is an impermissible collateral attack on the merits of a three-day suspension and other minor employment decisions, and is therefore precluded by the Civil Service Reform Act, 5 U.S.C. § 1101 *et seq.*[1] The matter should be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Stanford B. Hooker began his employment as an Oceanographer for NASA in 1991. ECF-1, Complaint at ¶¶ 1, 5, 6. Since 2003, he has held the civil service grade of GS-15, which is the highest pay grade level for General Schedule (GS) federal employees. *Id.* at ¶ 6. In 2010, Plaintiff worked as the lead scientist in Goddard's Calibration and Validation Office (CVO), a research activity within the Ocean Ecology Laboratory. *Id.* at ¶ 6. In late August 2010, three contractors who performed research services for Plaintiff alleged in written statements to NASA that he had made numerous inappropriate comments to them of an abusive,

---

[1] The Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, is codified as amended in scattered sections of Title 5 of the United States Code.

demeaning, or sexual nature.  The contractors, identified in the Complaint as Dr. Joaquin

Chaves, Karen Mitchell, and Aimee Neeley, were employees of Science Systems and

Applications, Inc. (SSAI), a company that performs contracts and grants with NASA involving

scientific research.[2]  *Id.* at ¶¶ 7-8, 10, 14, 16.  In the Complaint, Plaintiff refers to these

contractors as "staff," and he effectively supervised these contractors' work on a day-to-day

basis.  *See, e.g., id.* at ¶¶ 7, 10.  During the majority of time relevant to the contractors'

allegations, the CVO was located in an SSAI-leased suite in a building known as "BWTech" in

Halethorpe, Maryland.  *See id*.  The CVO moved on site to Goddard in 2011.[3]  *Id.* at ¶ 49.

The contractors' allegations were investigated by Robert Young of Goddard's Security

Division.  *Id.* at ¶ 10.  Mr. Young interviewed several witnesses between the dates of August 25,

2010, and September 30, 2010.  First, on August 25, 2010, he interviewed Aimee Neeley.  *See*

Ex. 1, ROI at 16-18.  Ms. Neeley informed Mr. Young that Plaintiff made inappropriate

comments to her in early July 2010, including a comment that referred to her "jacking off" Dr.

Chaves, a comment that her "butt crack" was showing, and a comment that a tube on her lab

table looked like something Plaintiff would "pee" in.  *Id.* at 17-18.  Ms. Neeley also related that

Plaintiff had called her to his room to discuss a future field assignment and began to undress in

front of her and change into a "dry" suit.  *Id*.  On the same day Mr. Young met with Ms. Neeley,

he interviewed Dr. Chaves.  *Id.* at 18.  Dr. Chaves corroborated Ms. Neeley's version of the two

---

[2] Although Plaintiff worked with these contractors on a day-to-day basis, these contractors
were formally supervised by Winfield Decker, SSAI Deputy Program Manager, who worked in
the company's Lanham, Maryland office.  *Id.* at ¶ 17.

[3] NASA is composed of 10 field centers across the nation with its Headquarters (HQ)
located at 300 E Street, S.W., in Washington, DC.  The NASA Administrator's office is at HQ.
Goddard, the field center that employs Plaintiff, is a large research and development (R&D)
facility located in the city of Greenbelt within Prince George's County, Maryland.  *See* ECF-1,
Complaint at ¶ 2.  Goddard employs approximately 3,000 civil servant employees and hosts
approximately 7,000 private contractors who work on site.

events at which he was present.  *Id.*  Also on August 25, 2010, Mr. Young interviewed Karen

Mitchell.  *Id.* at 18-19.  Ms. Mitchell described an incident that occurred the prior year in front of

U.S. Customs officials during a border crossing in which Plaintiff made a remark about his

mustache being the result of "eating fishy, smelly things," a reference she understood to mean

performing oral sex.  *Id.* at 19.  On August 25, Mr. Young interviewed another witness, Elaine

Firestone, who indicated that she had not heard any inappropriate comments.  *Id.* at 19.

　　　Mr. Young continued his investigation two days later, on August 27.  *Id.*  First, Mr.

Young met with Winfield Decker, an SSAI manager, who corroborated that his employees,

Neeley, Chaves, and Mitchell, had been previously notified him of inappropriate comments by

Plaintiff.  *Id.*  Next, Mr. Young met with Plaintiff on the afternoon of August 27.  *Id.* at 19-20.

Plaintiff admitted to Mr. Young that he made the remarks about "butt crack" and "jerking off."

*Id.* at 19.  He also confirmed the testimony of Ms. Mitchell that he had stated his mustache was

the result of "eating fishy, smelly things," but claimed his purpose in making these remarks was

so that certain Customs officials who were present when he made these remarks "could relate to

him."  *Id.* at 20.  Despite these admissions, Plaintiff asserts that the contractors' claims are

"unfounded," a "preponderance of fabrications," "falsehoods" of a "potentially criminal nature"

and "collusion."  *Id*. at ¶¶ 9, 10, 20.

　　　Mr. Young prepared an initial Report of Investigation (ROI) dated September 3, 2010,

which contained the contractors' written statements.  *Id.* at ¶¶ 10-11; Ex. 1, ROI.  These written

statements indicate, among other allegations, that Plaintiff called Ms. Mitchell a "moron"; he

asked Ms. Neeley if she would leave the building if it were on fire; and he told Ms. Mitchell that

he had put a candy bar down the gas tank of a rental car when the reservation was not handled to

his satisfaction.  *See* Ex. 1, ROI at 3.  Both Ms. Neeley's and Ms. Mitchell's statements indicate

a fear of retaliation.[4]  *Id.*  Neeley described Plaintiff as "spiteful and vindictive."  *Id.*  Dr.

Chaves's statement refers to the workplace as "a constant harassing environment" … [which] …

has "resulted in the departure of staff members from our office." *Id.* at 2-3.

On September 23, Mr. Young received a request from the human resources office to

continue his investigation and interview other potential witnesses.  *See* Ex. 2, Supp. ROI at 1.

Mr. Young continued his investigation on September 27, 2010, with an interview of Vanessa

Wright, an Oceanographer previously employed by SSAI.  *Id.* at 1-2.  Ms. Wright informed Mr.

Young that she found the work environment with Mr. Hooker to be "uncomfortable," and also

indicated that Mr. Hooker had made inappropriate comments, but she could not recall anything

specific.  *Id.*  On September 30, 2013, Mr. Young re-interviewed Ms. Mitchell, and interviewed

John Morrow, an employee of Biospherical Instruments, Inc. (BSI).[5]  *Id.* at 3.  Mr. Morrow

indicated that he had not heard Plaintiff use the type of language alleged.  *Id.*  Mr. Young also

interviewed Plaintiff for a second time on September 30, 2013, before issuing a Supplemental

ROI on October 5, 2010.[6]  *Id.*, *see also* ECF-1, Complaint at ¶ 13, 17, 22.  Plaintiff obtained

union representation on or before this interview, and his representative, Stephen Leete, witnessed

Plaintiff's written statement to Mr. Young on September 30, 2010.  Ex. 2, Supp. ROI at 5;

Complaint at ¶ 20.

Beginning in late 2010, Agency officials considered the evidence that had been

accumulated during Mr. Young's investigation.  *Id.*  Given the corroborated statements of the

witnesses, and Plaintiff's own corroboration of certain statements that the contractors alleged Mr.

---

[4]  As the Complaint indicates, Ms. Mitchell also expressed fear of retaliation by Plaintiff because he claimed to have previously ruined the career of another scientist; vandalized a rental car because he was unhappy with the service provided; and retaliated against his neighbors with whom he had altercations.  *Id.* at ¶ 33.

[5]  BSI is a company that designs instruments used by the CVO and funded by NASA.

[6] Plaintiff maintains that this Supplemental ROI was a "secret record."  *Id.* at ¶¶ 22, 78, 79.

Hooker had made, NASA determined that remedial action was necessary to address Plaintiff's conduct and protect the contractors from future harassment.  Consequently, for a period of time, Plaintiff was prohibited from having direct contact with the three aggrieved contractors, which required a revision of his duties.  *Id*. at ¶¶ 8, 65.

On November 8, 2010, Plaintiff's "Within-Grade Increase (WIGI)" was denied by his second-level supervisor, Dr. David Adamec, due to unsatisfactory performance.[7]  *See id.* at ¶¶ 6, 20, 26, 30.  On April 18, 2011, Plaintiff's third-level supervisor, Dr. Peter Hildebrand, affirmed this determination, and the WIGI denial remained in effect for one year.  *See id*. at ¶47.  Also on April 18, 2011, Dr. Adamec notified Plaintiff that he would receive a "Needs Improvement" performance appraisal for the 2010 - 2011 performance cycle.  *See* ECF-1, Complaint at ¶¶ 6, 46, 50.

On December 2, 2010, Dr. Adamec proposed Plaintiff's suspension for three days without pay based on two charges:  Disrespectful, Abusive or Obscene Language to or about others; and Conduct Unbecoming of a Federal Employee.  *Id.* at ¶ 33; Ex. 3 at 2.  Thereafter, on or before January 28, 2011, Plaintiff obtained his current counsel of record.  *Id.* at ¶ 37.  On January 28, 2011, as part of the reply process for the proposed suspension, Plaintiff's counsel assisted him in filing a lengthy written submission and detailed oral presentation to the Deciding Official, Dr. Dorothy Zukor, the Deputy Director of the Earth Sciences Division at Goddard.  *See id.; see also* Exhibit 3 at 1-4.

---

[7] Federal employees on the GS schedule are entitled to periodic increases in the employee's rate of basic pay from one step of the grade of his or her position to the next higher step of that grade. Among other requirements, a GS employee must be performing at an acceptable level of competence to merit a within-grade increase.  *See* 5 C.F.R. 531.401 *et seq.*  Due to the misconduct, Plaintiff was deemed not to be performing at an acceptable level of competence and received a Needs Improvement rating.  Specifically, he was found deficient on the performance elements of Communications and Collaboration and Teamwork.  *See, e.g.,* Ex. 3 at 5.

Dr. Zukor determined to uphold the suspension on August 10, 2011.  *See* ECF-1, Complaint at ¶¶35, 37; Ex. 3.  In her decision to suspend Plaintiff, she required Plaintiff to take anti-harassment training beyond the mandatory training he had already received that was required for all Goddard employees.  *See* Ex. 3 at 6.  Dr. Zukor also required him to utilize a leadership coach, Willa Gaitanis, to enhance his ability to work with others in a professional manner.[8]  *Id.* at 6-7, ECF-1, Complaint at ¶ 53.

Subsequently, Plaintiff filed a union grievance over Dr. Zukor's decision to impose the three-day suspension.  ECF-1, Complaint at ¶¶ 57, 61.  His grievance was denied in separate grievance appeal proceedings up the chain of the command.  On September 22, 2011, Dr. Piers Sellers, the Deputy Director of the Earth Sciences Directorate, denied the Step 2 grievance.  *Id.* On November 4, 2011, Mr. Arthur Obenschain, the Deputy Director of the Goddard Space Flight Center, denied the Step 3 grievance.  *Id.*  Later, on December 2, 2011, Plaintiff's union invoked arbitration over the denial of his grievance; however, to date, the arbitration has not occurred.

Separately, Plaintiff challenged NASA's personnel actions by filing whistleblower complaints with the Office of Special Counsel (OSC) and NASA's Office of the Inspector General (OIG).  *Id.* at ¶ 10.  Neither the OSC nor OIG took any remedial action on his behalf. By letter dated April 13, 2011, the OIG notified Plaintiff's attorney that it was declining to investigate his allegations in light of the OSC investigation.  *See* Ex. 4, Letter from OIG.  The OIG also noted that his alleged whistleblower disclosures forming the basis of his retaliation claim, on their face, post-dated the proposed suspension and WIGI denial.  *Id.*  On October 23, 2012, the OSC completed its investigation of Plaintiff's allegations, and OSC determined to close its case file and not pursue the matter further.  *See* Ex. 5, Letter from OSC.

---

[8] NASA's Coaching Program is described at
http://nasapeople.nasa.gov/training/coachmentor/default.htm.

Plaintiff has also filed an Equal Employment Opportunity Commission (EEOC) case against NASA alleging a hostile work environment based on a perceived mental disability arising from Ms. Mitchell's written statement indicating that others had characterized him as "pathological." *See* ECF-1, Complaint at ¶ 33.  This case, EEOC No. 531-2012-000336X, is pending at the EEOC Baltimore Field Office.

On July 22, 2011, Plaintiff filed a whistleblower reprisal claim related to the personnel actions at the Merit Systems Protection Board (MSPB).  *See Hooker v. NASA*, 2012 M.S.P.B. LEXIS 1943 at *1.[9]  Plaintiff's claim was premised on his assertion that the appealed personnel actions were retaliation for his "blowing the whistle" to NASA managers that Agency personnel had violated the Privacy Act and the contractor witnesses had made criminal false statements against him.  *Id.* at *5.  These contractors, Neeley, Chaves and Mitchell, testified at the hearing. *Id.* at *41, 44, 49.  The MSPB Administrative Judge determined that NASA proved by clear and convincing evidence that the Agency would have taken the appealed personnel actions without regard for any whistleblowing.  Judicial notice may be taken of this proceeding, which is a matter of public record.[10]  *Id.* at *56.  The Administrative Judge did not rule on whether the

---

[9]  Plaintiff separately appealed NASA's WIGI denial to the MSPB; however, he later withdrew the appeal and the claim was dismissed with prejudice by the MSPB on August 30, 2011.  2011 M.S.P.B. LEXIS 5233.

[10] The MSPB proceeding is significant because Plaintiff cites to his MSPB exhibits in his present Complaint, although he does not attach them for the Court's review.  For example, he refers to "App. Ex. H," which he identifies as the "secret" Supplemental ROI prepared by Mr. Young. *See* ECF-1, Complaint at ¶ 78.  In other words, Plaintiff used the Supplemental ROI as his own exhibit before the MSPB, and thus, it was no secret, as he claims in this court action.  The MSPB judge's April 3, 2012 decision is also noteworthy because it discusses Plaintiff's hearing testimony in which he acknowledged making inappropriate comments, including references to oral sex in the presence of Ms. Mitchell and others.  *Hooker,* 2012 M.S.P.B. LEXIS 1943 at *45-46.  The Administrative Judge found that Plaintiff did not appreciate the impropriety of his conduct or the impact his conduct had on his employer.  *Id.* at *42-43.

Privacy Act was violated because this was not an element of proof for the retaliation claim.[11]
The decision stated that "the appellant need not prove that the condition disclosed actually
established a … violation …"  *Id.* at *22.

Plaintiff appealed the Administrative Judge's decision to the MSPB board members, who
affirmed the lower administrative decision on March 25, 2013.  *See* 2013 M.S.P.B. LEXIS 1599.
On May 24, 2013, Plaintiff appealed the MSPB's final decision to the U.S. Court of Appeals for
the Federal Circuit (Case Docket Number 13-3117).  That appeal is pending.

## LEGAL STANDARDS OF REVIEW

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of plaintiff's
complaint.  *See Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006); *Edwards v.
City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  While Fed. R. Civ. P. 8 only requires a
"short and plain statement of the claim showing that the pleader is entitled to relief, it still
requires a "*showing* rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v.
Twombly,*  550 U.S. 544, 555 n.3 (2007) (emphasis added).  That showing must consist of more
than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of
further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  There must consist
of at least "enough facts to state a claim of relief that is plausible on its face."  *Twombly*, 550
U.S. at 570.

In deciding a motion to dismiss, the court should first review the complaint to determine
which pleadings are entitled to the assumption of truth.  *See Iqbal*, 556 U.S. at 679.  "When there

---

[11] Moreover, the MSPB has held that it lacks jurisdiction to review Privacy Act claims because
federal district courts are the appropriate fora.  *Calhoon v. Dept of Treasury*, 2001 M.S.P.B.
LEXIS 1072.  Similarly, a published decision by the U.S. Court of Appeals for the Federal
Circuit, while not precedential, stated that the Board does not have jurisdiction to consider
Privacy Act allegations because jurisdiction is vested in the district courts.  *Martin v. Dept. of
Army* (Fed. Cir. 2000, nonprecedential No. 00-3302).

are well pleaded factual allegations, a court should assume their veracity and then determine

whether they plausibly give rise to an entitlement to relief." *Id.*  While a court must construe all

factual allegations in the light most favorable to the plaintiff, *see Harrison v. Westinghouse

Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999), a court need not accept unsupported legal

allegations, *Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal

conclusions couched as factual allegations, *Papasan v. Allain,* 478 U.S. 265, 286 (1986), or

conclusory factual allegations devoid of any reference to actual events.  *United Black

Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Fed. R. Civ. P. 56(b) provides that a party against whom a claim is filed "may, at any

time, move with or without supporting affidavits for a summary judgment in the party's favor as

to all or any part thereof."  Summary judgment is only appropriate where "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that the is no genuine issue as to any material fact." Fed. R. Civ. P. 56(a).  The mere

existence of some alleged factual dispute in the case will not defeat an otherwise properly

supported summary judgment motion.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48

(1986).  Summary judgment is warranted if there is no genuine dispute of material fact and, as a

matter of law, the moving party is entitled to a judgment.  Fed. R. Civ. P. 56(e); *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1984).

An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could

find in favor of the non-moving party.  *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is

"material" if it has the potential to affect the outcome of the case under the applicable legal

standard.  *Anderson,* 477 U.S. at 248.

The moving party's burden of proving that there are no genuine facts in dispute may be met by consideration of affidavits, exhibits, depositions, and other discovery materials.  Fed. R. Civ. P. 56; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).  However, the moving party will be granted summary judgment if, with or without these accompanying materials, it demonstrates that summary judgment is appropriate. *Celotex v. Catrett,* 477 U.S. at 327 (summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'").  Once the moving party presents a properly supported motion for summary judgment, it is the non-moving party's burden to set forth specific facts, through affidavits or other evidence, that there is a genuine issue for trial.  Fed. R. Civ. P. 56.  This burden is "particularly strong when the non-moving party [also] bears the burden of proof."  *Caussade v. Brown*, 924 F. Supp. 693, 696 (D. Md. 1996) (citations omitted).  Furthermore, the non-moving party "cannot create a genuine issue through mere speculation or the building of one inference upon another."  *Id.* at 696-97 (*citing Beale v. Hardy*, 769 F.2d 2213, 2214 (4th Cir. 1985).

## ARGUMENT

### A.  Plaintiff's Request for Injunctive and Declaratory Relief Should Be Dismissed for Failure to State a Claim.

Plaintiff's request for injunctive and declaratory relief should be dismissed because no such relief is available under the Privacy Act subsection which forms the basis of Plaintiff's suit. Plaintiff pursues his requested relief under 5 U.S.C. § 552a(g)(1)(D), the Privacy Act's "catch all provision" which allows for judicial review if an agency fails to follow provisions of the Act that do not have specified relief.  *See Reinbold v. Evers*, 187 F.3d 348, 359 (4th Cir. 1999); *Leighton v. CIA*, 412 F. Supp. 2d 30, 35 (D.D.C. 2006).  Plaintiff specifically requests that the court

"retroactively reverse each of the adverse determinations" and award him back pay, benefits, interest and a "clean record." *See* ECF-1, Complaint at p. 52.

   This Circuit has held, however, that "[w]hile the Privacy Act permits an individual to contest the accuracy of the facts contained in an agency's administrative records, the Privacy Act does not permit an individual to force an agency to 'rewrite history, changing the record in Orwellian fashion to pretend that it reached some other conclusion.'" *Reinbold,* 187 F.3d at 361 (quoting *Douglas v. Agric. Stabilization and Conservation Serv.,* 33 F.3d 784, 785 (7th Cir. 1994)). Similarly, the D.C. Circuit has held, however, that "only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs." *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1122 (D.C. Cir. 2007) (*citing Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)). In an action to reverse a federal employee's termination, the District Court for the District of Columbia dismissed the claim holding that injunctive relief is limited to only two specific situations, under § 552a(g)(1)(A) (suit for amendment of records) and § 552a(g)(1)(B) (suit for disclosure of records). *See Kusar v. Trans. Sec. Admin*, 581 F. Supp. 2d 7, 19 (D.D.C. 2008) (*citing Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988)); *see also Risley v. Hawk*, 108 F.3d 1396, 1397 (D.C. Cir. 1997).

   In the instant case, Plaintiff seeks injunctive and declaratory relief that is unrelated to the amendment or disclosure of records. *See generally* ECF-1, Complaint. Accordingly, his claims for injunctive and declaratory relief are not actionable and should be dismissed. *See Reinbold,* 187 F.3d at 361 ("the Privacy Act does not allow a court to alter records that accurately reflect an administrative decision, or the opinions behind that administrative decision, no matter how contestable the conclusions may be."); *AFGE v. Hawley*, 543 F. Supp. 2d 44, 54 (D.D.C. 2008); *Leighton*, 412 F. Supp. 2d at 21. Furthermore, the Privacy Act does not require agencies to

confirm the accuracy of its opinions or judgments.  *See White v. Office of Personnel Mgmt.*, 787

F.2d 660, 662 (D.C. Cir. 1986).  An individual who is unhappy with the opinions filed in his

records can obtain relief by placing a concise statement in his records which sets forth his

disagreement with the opinions contained therein.[12]  *Id.*

 Importantly, prior to the transfer of this action to this District, Plaintiff, through counsel,

admitted that his claims for injunctive and declaratory relief are "not actionable."  *See* ECF-10 at

15 n.3 ("Dr. Hooker admits that any claim for injunctive and/or declaratory relief is not

actionable….").  Despite this admission, Plaintiff has not officially withdrawn his claim;

therefore this Court should dismiss it.

**B. The Complaint in its Entirety Should Be Dismissed Because it Fails to State a Claim upon which Relief Can Be Granted, or Alternatively, the Complaint Should Be Dismissed As a Matter of Law.**

 Furthermore, the Complaint in its entirety should be dismissed because Plaintiff is unable

to state a claim upon which relief can be granted, or, alternatively, establish his Privacy Act

claims as a matter of law.  Section 552a(e)(2) of the Privacy Act, the provision that Plaintiff

maintains NASA violated, requires federal agencies to "collect information to the greatest extent

practicable directly from the subject individual when the information may result in adverse

determinations about an individual's rights, benefits, and privileges under Federal programs."  5

U.S.C. § 552a(e)(2).  This section was designed to "discourage the collection of personal

information from third party sources and therefore to encourage the accuracy of Federal data

gathering."  *Waters v. Thornburgh*, 888 F.2d 870, 874 (D.C. Cir. 1989).  Plaintiff sues for relief

under 5 U.S.C. § 552a(g)(1)(D), requiring him to prove that (1) the agency did not obtain

information from him "to the greatest extent practicable," (2) this violation resulted in an adverse

---

[12]  Plaintiff has not sought amendment of his records under the Privacy Act, 5 U.S.C. § 552a(d)(2), and therefore has not exhausted his administrative remedies in this regard.  In any event, the administrative records include his denials of the allegations.

effect on him (as opposed to an adverse determination), and (3) the agency's conduct was "intentional or willful."  *See Hogan v. England*, 159 F. App'x 534, 537 (4th Cir. 2005); *Waters*, 888 F.2d at 872; *see also Olivares v. NASA*, 882 F. Supp. 1545, 1549 (D. Md. 1995); *Velikonja v. Federal Bureau of Investigation*, 362 F. Supp. 2d 1, 19 (D.D.C. 2004).  Plaintiff is unable to meet this burden.

Plaintiff's principal claim is that the Agency should have interviewed him first given his belief that the Privacy Act requires obtaining information from him first prior to seeking information from third parties.  ECF-1, Complaint at ¶ 12.  As the facts demonstrate, the individual charged with doing the investigation, Mr. Young, interviewed four witnesses on August 25, 2010, and another on the morning of August 27 before interviewing Plaintiff on the afternoon of August 27.  *See supra* at pp. 3-5.  The investigator then interviewed (or re-interviewed) two additional witnesses on September 27, 2010 and September 30, 2010, before interviewing Plaintiff again on September 30, 2010.  *Id.*  Contrary to Plaintiff's assertions, the Privacy Act did not require NASA to seek information from him first before interviewing third parties.

The Fourth Circuit has addressed this very issue in a Privacy Act challenge brought by a Navy electrician who challenged the Navy's conduct by investigating other witnesses regarding claims of his intoxication on the job prior to interviewing him:

> Hogan also complains that the Navy did not interview him first.
> This fact, by itself, does not rise to the level of a Privacy Act
> violation.  So long as the agency inevitably will need to interview
> both Hogan and others, the Act takes no position on the order in
> which they are approached.  Indeed one reasonably might argue
> that Hogan benefitted from being interviewed late in the process.
> *Cf. Carton v. Reno,* 310 F.3d 108, 112 (2d Cir. 2002) ("[I]t might
> be expected that the interviews with the complainants and others
> would sharpen the issues and focus the charges in a way that would
> allow Carton to respond more particularly.").

*Hogan,* 159 F. App'x at 537.  Thus, the Fourth Circuit rejected Hogan's challenge that the Privacy Act's guidance to "collect information to the greatest extent practicable directly from the subject individual" required the Navy to interview him prior to interviewing third parties.  *Id.*

The District Court for the District of Columbia also agrees that, "Nothing in the statute outlines the order [of interviewing witnesses] or prohibition of third party contacts." *Arlie A. Alexander v. Internal Revenue Service*, No. 86-0414, 1987 WL 13958 (D.D.C. June 30, 1987), *citing Merola v. Dep't. of Treasury*, No. 83-3323, slip op. at 8-9 (D.D.C. October 24, 1986).  The *Alexander* court referred to the Office of Management and Management and Budget (OMB) Privacy Act Guidelines that suggest that third parties may be consulted when "the kind of information needed can only be obtained from a third party such as investigation of possible criminal misconduct."  40 Fed. Reg. 28,948, 28,961 (July 9, 1975).

The D.C. Circuit in *Brune v. IRS* found it not practicable to obtain information directly from a plaintiff IRS agent who was under investigation for misconduct where he could have intimidated potential taxpayer witnesses.  *Brune v. Internal Revenue Service*, 861 F.2d 1284, 1287 (D.C. Cir. 1988).  The court noted that, when confronted, an accused would likely advance an explanation in an attempt to obviate the need to contact third parties.  *See also Olivares,* 882 F. Supp. at 1551 ("Until such time as someone reports threatening behavior, there is, quite simply, no information to elicit from the individual.").

In another case examining the order of interviewing witnesses, the District Court for the District of Columbia found it permissible for an agency to interview numerous witnesses before contacting the plaintiff.  *Thompson v. Dep't. of State*, 400 F. Supp. 2d 1 (D.D.C. 2005).  The *Thompson* court found that claims of impropriety raised by the employee's coworkers were far from resolvable by objective evidence in the plaintiff's possession, and therefore, the

government was permitted to question the co-workers first and was not required to conduct a "piecemeal" investigation. *Thompson*, 400 F. Supp. at 22-25. The court noted that it is impracticable to think that the most subjective accusations, such as employee mistreatment and harassment, can be resolved by an accused's response. *Id*. at 20-22; *see also Hogan,* 159 F. App'x at 536 (noting that "[t]he probability that, when confronted [the accused] will advance an explanation . . . sufficient to obviate the need to contact third parties is minimal.") (internal citations omitted).

Courts in others circuits have reached similar results. For instance, the Sixth Circuit found it impracticable to interview the plaintiff first with respect to allegations of retaliation and mistreatment of employees because of "practical concerns" that he would "threat[en] and intimidate fellow co-workers." *See Cardamone v. Cohen*, 241 F.3d 520, 527-28 (6th Cir. 2001). The court found it proper that the agency interviewed 61 witnesses prior to speaking with Cardamone. Similarly, the Second Circuit found that allegations of abusive conduct could not be resolved by speaking with plaintiff first. *Carton v. Reno*, 310 F.3d 108, 112 (2d Cir. 2002).

In *Bailey v. Principi*, 2004 U.S. Dist. LEXIS 9028 (E.D. Ill. Apr. 23, 2004), the court held that in a sexual harassment case it was not practicable to interview the subject first. The court stated that allegations of sexual harassment deal with issues of perception, and by collecting information from third parties first, the government was able to collect all pertinent information and focus its questions so that the subject could answer them all at once. In *Wiatr v. Defense Finance and Accounting*, 2008 U.S. Dist. LEXIS 523467 (N.D.N.Y July 7, 2008), the court determined that due to the subjective nature of an investigation into discourteous conduct, there was no reasonable possibility that the plaintiff could have provided objective, unalterable

information that would have ended the investigation.  Even a categorical denial would not have obviated the need for further investigation.

Similar to the case in *Bailey*, NASA had to obtain the contractors' complaints first to understand the breadth of the allegations and investigate them.  Moreover, based on Ms. Mitchell's allegations, there was concern that Plaintiff, who functioned as the contractors' supervisor, could intimidate or retaliate against them.  *See* ECF-1 Complaint at ¶ 33.  The Agency had a duty to discover the extent of the problem in the workplace and to take prompt remedial action.  *See Burlington Industries v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).[13]  For these reasons, it would not have been reasonable or practical to interview Plaintiff first.  *Hogan,* 159 F. App'x at 537.

By any reasonable interpretation, NASA obtained information from Plaintiff regarding the SSAI contractors' allegations to the "greatest extent practicable."  He had multiple opportunities to provide his version of events.  As the Complaint indicates, Plaintiff was interviewed twice by Mr. Young; he and his attorney provided an oral and written reply to Dr. Zukor concerning the allegations; and he filed grievances with Dr. Sellers and Mr. Obenschain further explaining his version of events.  Additionally, Plaintiff testified in a hearing at the MSPB regarding the contractors' allegations.  The reviewing officials, however, did not find

---

[13] Indeed Plaintiff's own counsel has published legal guidance in an article title "Misconduct Investigations And Exceptions To The Privacy Act," recognizing these very exceptions to the Privacy Act's general rule that information be collected first from the subject of an investigation "to the greatest extent practicable." *see* http://www.tullylegal.com/our-team/johnmahoney; full article at attached, Exhibit 4 ("In most cases, EEO investigations concerning allegations of discrimination, reprisal or sexual harassment against a supervisor would rely on at least some other sources of information (such as the complainant's statement) before going to the subject against whom allegations were made.  This is an example of where it is not practicable to interview the subject first."); *see also* http://privacy.lettercarriernetwork.info/Privacy%20ActMust%20ask%20Emp%201st%20about% 20Misconduct.pdf

Plaintiff's explanations persuasive, and additional information provided by Plaintiff had no impact on the personnel decisions or litigation results.  As the *Carton* court found, "the right of the employee to present his own case in writing and to refute the conclusions or information provided by others is adequate to meet the requirements of 5 U.S.C. § 552a(e)(2)," *i.e.*, obtaining information to the greatest extent practicable from the subject employee.  *Carton*, 310 F.3d at 112 (internal citation omitted).  Because NASA fully heard his explanation of events, Plaintiff cannot establish that information was not obtained from him to the greatest extent practicable.

As Plaintiff cannot show that information was not obtained from him "to the greatest extent practicable," he necessarily fails to show a violation that resulted in an "adverse effect" on him, or that the agency's conduct was "intentional or willful."  In proving causation, Plaintiff must show that the Agency's failure to comply with the statute resulted in an adverse effect.  *See Hogan*, 159 F. App'x at 537.  This inquiry must focus on whether compliance with the statute would have changed the outcome.  *See Velikonja*, 362 F. Supp. 2d at 22-23 (D.D.C. 2004); *Gard v. U.S. Dept. of Educ.*, 789 F. Supp. 2d 96, 109 (D.D.C. 2011).  In this case, even if Defendant interviewed Plaintiff first, it would not have changed the outcome because the decision-maker needed to hear the full story from the contractors to understand the breadth of the allegations before weighing Plaintiff's testimony and determining whether discipline was appropriate.  Thus, should this Court find a technical violation, there is no credible argument that such violation had an "adverse effect" on Plaintiff.  The same conclusion would have been reached.

If a technical violation is found, the facts also do not demonstrate that any violation was "intentional or willful."  The statute does "not make the Government strictly liable for every affirmative or negligent act that might be said to technically violate the Privacy Act's provisions.*"  See Albright v. United States*, 732 F.2d 181, 189-90 (D.C. Cir. 1984).  Rather,

when a Plaintiff brings a damages claim, the violation must be so "patently egregious and unlawful" that anyone undertaking it should have known it was "unlawful." *Wisdom v. Dep't. of Housing & Urban Dev.*, 713 F. 2d 422, 425 (8th Cir. 1983); *see also Chapman v. NASA*, 736 F.2d 238, 242-43 (5th Cir. 1984).  Therefore, to meet his burden, Plaintiff must prove that the offending agency acted "without grounds for believing [its actions were] lawful" or that it "flagrantly disregarded" the rights guaranteed under the Privacy Act.  *Albright*, 732 F.2d at 189; *see also Hogan*, 159 F. App'x at 537 (noting that "The 'intentional or willful' standard requires a mens rea 'somewhat greater than gross negligence'"); *see also Olivares*, 882 F. Supp. at 1550; "Analysis of House and Senate Compromise Amendments to the Federal Privacy Act," reprinted in 120 Cong. Rec. 40,405, 40,406 (1974) (same).

Plaintiff cannot demonstrate that NASA's conduct was intentional or willful under this legal standard.  The record here does not reflect gross negligence or flagrant disregard for Plaintiff's rights.  Rather, the record reflects a careful review of the allegations, full consideration of Plaintiff's version of events, and careful consideration of appropriate disciplinary measures.  In this case, NASA obtained Plaintiff's explanations regarding the allegations through the administrative reply process.  As the facts above demonstrate, Plaintiff was interviewed on two occasions by the investigator, and he and his attorney provided a lengthy oral and written presentation to the decision-making official.  Despite all this, the Agency found the contractors more credible.  The MSPB judge also considered Plaintiff's testimony and did not reverse any personnel actions.  Plaintiff continues to deny most of the three contractors' allegations, but this fact does not require NASA to void any personnel actions.  Furthermore, given the nature of the harassment and retaliation allegations against him, it was not practicable for NASA to seek information from him first.  For these reasons, Plaintiff cannot establish that

NASA's investigation was conducted in a manner that was a willful or intentional violation of his rights under the Privacy Act.

As Plaintiff cannot establish his burden of proof that (1) the agency did not obtain information from him "to the greatest extent practicable," (2) the violation resulted in an adverse effect on him, and (3) the agency's conduct was "intentional or willful," the entire claim should be dismissed because Plaintiff cannot establish the elements of proof that would entitle him to relief.  *See Hogan v. England*, 159 F. App'x at 537; *Waters*, 888 F.2d at 872; *see also Olivares v. NASA*, 882 F. Supp. at 1549; *Velikonja v. Federal Bureau of Investigation*, 362 F. Supp. 2d 1, at 19.   Alternatively, the Court should grant summary judgment to Defendant as there is no genuine dispute as to any material fact and Defendant is entitled to judgment as a matter of law.[14]

---

[14] Plaintiff also maintains that the individual charged with investigating the contractors' allegations, Mr. Young, violated his *Weingarten* and *Garrity* rights.  *See* ECF-1, Complaint. at ¶ 10.  However, even if true, these assertions fail to state a claim under the Privacy Act.  Plaintiff alleges that he was wrongfully given a *Garrity* rights warning instead of a *Kalkines* warning prior to the interview.  *Id.* at ¶ 10.  Such a claim would be relevant to criminal proceedings and could potentially result in immunity from prosecution.  *Garrity v. New Jersey*, 385 U.S. 493 (1967); *Kalkines v. United States*, 473 F.2d 1391 (Ct. Cl. 1973).  This is a civil case, however, and Plaintiff cannot show that he suffered any harm as a result of his receipt of a *Garrity* warning in place of a *Kalkines* warning, let alone state a claim that is redressable by the Privacy Act.  Similarly, his *Weingarten* claim is not applicable because this is not a labor relations case pursuant to the Federal Labor-Management Relations Statute, Chapter 71 of Title 5, U.S. Code.  Moreover, under *Weingarten v. NLRB*, 420 U.S. 251 (1975), for a violation to exist, an employee must invoke the right to representation and be denied representation.  An agency is under no legal duty to notify the employee of any right to union representation.  Moreover, the Complaint indicates Plaintiff had representation.  *See* ECF-1, Complaint at ¶¶ 20, 34 & 47.  None of the authority cited by Plaintiff creates an exclusionary rule in a Privacy Act case.

**C.  Plaintiff's Action Is an Impermissible Collateral Attack on the Merits of Minor Employment Decisions and Fails to State a Claim upon Which Relief May Be Granted Under the Privacy Act.**

Finally, Plaintiff's action is an impermissible collateral attack on the merits of an employment decision and should be dismissed.  "An employee may not collaterally attack an adverse employment decision under the guise of a Privacy Act suit."  *See Wills v. OPM,* 1994 WL 22349 (4th Cir. 1994) (*citing Houlihan v. OPM,* 909 F.2d 383, 385 (9th Cir. 1990)).  The Privacy Act was not intended to shield federal employees from the vicissitudes of federal personnel management decisions.  *Hubbard v. United States EPA Adm'r*, 809 F.2d 1, 5 (D.C. Cir. 1986).  The Privacy Act pertains to the accuracy of records.  It is not a vehicle for federal employees to second-guess the judgments or conclusions of federal officials regarding adverse personnel decisions.  *See Lee v. Geren*, 480 F. Supp. 2d, 198, 207 (D.D.C. 2007).

Further, Plaintiff's challenge to the personnel actions and investigation is more akin to a Civil Service Reform Act (CSRA) claim, not a Privacy Act claim.  The CRSA "comprehensively overhauled the civil service system, creating an elaborate new framework for evaluating adverse personnel actions against federal employees." *United States v. Fausto*, 484 U.S. 439, 443 (1988).  However, the CSRA does not provide for judicial review of suspensions that are 14 days or less.  *Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983); *see also* 5 U.S.C. §§ 1214, 2302, 7513 & 7703.  Additionally, the CSRA precludes non-CSRA remedies for an adverse personnel action even where the CSRA does not make those remedies available to the plaintiff.  *See Feldman v. Central Intelligence Agency*, 797 F. Supp. 2d 29, 39 (D.D.C. 2011).  Unable to bring a CSRA claim, Plaintiff attempts to squeeze a square peg into a round hole by labeling it a Privacy Act claim.  The D.C. Circuit has stated "[t]his court has refused to allow the exhaustive scheme of the CSRA to be impermissibly frustrated by granting litigants, under the aegis of the Privacy Act

or otherwise, district court review of personnel decisions judicially unreviewable under the

CSRA." *Kleiman v. U.S. Dep't. of Energy*, 956 F.2d 335, 338 (D.C. Cir. 1992); *see also Lim v.*

*United States*, 2011 WL 2650899 (D. Md. 2011) ("[W]hile labeled as a Privacy Act violation,

Lim is ultimately challenging the basis for his discharge, a personnel decision which cannot be

challenged outside the framework of the CSRA.").

To determine whether a plaintiff has pled a complaint governed by the CSRA as a

claim under the Privacy Act, it is "necessary to scrutinize closely any 'asserted causation link'"

between the Privacy Act violations alleged and the adverse personnel actions. *See Gard*, 789 F.

Supp. 2d at 106-08; *Velikonja*, 362 F. Supp. 2d at 22-23. As in the *Feldman* and *Lee* cases

involving five and fourteen-day suspensions, respectively, Plaintiff's claim is fundamentally an

attack on the judgment of federal officials rather than the accuracy of government records.

*Feldman*, 797 F. Supp. 2d at 47; *Lee*, 480 F. Supp. 2d at 208. His suit concerns disagreement

with NASA's conclusions that he engaged in misconduct, as well as the content of the

contractors' statements. First, Plaintiff has not asserted that an inaccurate or incomplete record

actually caused him any adverse effect. *See generally* ECF-1, Complaint. His action

does not seek to amend his government records, presumably because they accurately reflect the

personnel decisions taken by NASA. Additionally, Plaintiff cannot pursue an amendment claim

in this Court because he has not filed a formal administrative request for correction of the record

with NASA, which is part of the administrative exhaustion process. *See* 5 U.S.C. § 552a(d)(2).

The fact that Plaintiff seeks a "clean record," rather than a correction of records, is evidence that

he seeks to litigate the substance of adverse personnel actions. *Cf. Kleiman*, 742 F. Supp. at 699

(Because his claim affects the employment relationship itself, "allowing Plaintiff to proceed

under the Privacy Act would undermine the basic principles of the CSRA.").

Plaintiff's version of the disputed events is amply reflected in the administrative record of his various appeals of the personnel actions. His input was obtained to the greatest extent practicable. NASA's records are accurate; he merely disagrees with them. Plaintiff's claim that he was not given the opportunity to challenge the accuracy of the "secret" Supplemental Report of Investigation similarly takes issue with the content of a record with which he disagrees.[15] Therefore, Plaintiff's Privacy Act claim should be dismissed for failure to state a claim upon which relief may be granted. Alternatively, there being no genuine dispute of material facts, this claim should be dismissed as a matter of law.

## CONCLUSION

Based on the reasons set forth above, Plaintiff's action should be dismissed for failure to state a claim upon which relief can be granted. Alternatively, the Court should grant summary judgment in favor of Defendant.

//

//

---

[15] As the Supplemental Report of Investigation (ROI) is attached as Exhibit 2, it is hardly a "secret." As noted above, Plaintiff submitted the document as his own exhibit, "App. Ex. H," in the MSPB proceedings. *See* ECF-1, Complaint at ¶¶ 77, 78. He stated that he received the document from the Agency in discovery on September 16, 2011. *Id.* at ¶ 13. Plaintiff had the opportunity to examine the Agency official who conducted the investigation and prepared the report, and he had the opportunity to provide rebuttal via his own testimony and submissions before the MSPB. *Id.* at ¶ 78; s*ee also* 2012 M.S.P.B. LEXIS 1943 at *36. He also had the opportunity to provide any rebuttal to the Supplemental ROI prior to the Agency's grievance decisions that were issued on September 22, 2011 and November 4, 2011. *See* ECF-1, Complaint at ¶¶ 57, 61. Notably, Plaintiff has not demonstrated how any delay in his receipt of the supplemental report had an adverse effect on him. Plaintiff's oral and written rebuttals did not alter the outcome of the personnel actions he contested before the MSPB or Agency. Finally, he has never sought to amend the administrative record pursuant to the Privacy Act, and thus, has not exhausted his administrative remedies in this regard. *See* 5 U.S.C. § 552a(d)(2).

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


_____/s/_____
Victor M. Lawrence
Special Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
Tele:   410-209-4800

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 24th day of October, 2013, a copy of Defendant's

Memorandum in Support of Motion to Dismiss, or in the Alternative, for Summary Judgment

was sent by first class mail, postage prepaid, to:

> John Patrick Mahoney
> TULLY RINCKEY PLLC
> 1800 K Street, NW
> Suite 1030
> Washington, DC  20006

\_\_\_\_/s/_____
Victor M. Lawrence
Special Assistant United States Attorney