IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STANFORD B. HOOKER,
   *Plaintiff,*

v.                                                    Civil Action No. ELH-13-2552

NATIONAL AERONAUTICS AND
SPACE ADMINISTRATION (GSFC),
   *Defendant.*

**MEMORANDUM OPINION**

Stanford B. Hooker, Ph.D., plaintiff, filed suit against his employer, the National Aeronautics and Space Administration ("NASA"), defendant, alleging that NASA violated the Privacy Act, 5 U.S.C. § 522a, in its investigation of allegations of Hooker's workplace misconduct. *See* ECF 1 ("Complaint").[1] The essence of plaintiff's claim is that, in conducting its investigation, NASA failed to collect information directly from Hooker "to the greatest extent practicable," as required by the Privacy Act.[2] Hooker asks the Court to "retroactively reverse each of the adverse determinations and effects of the Agency's Privacy Act violations, with backpay, benefits, interest, and a clean record." *Id.* at 52. He also requests monetary damages and attorney's fees. *Id.*

NASA filed a Motion to Dismiss, or in the Alternative, For Summary Judgment, along with a supporting memorandum (ECF 22–1), and exhibits (collectively, "Motion"). Hooker filed an opposition to the Motion ("Opposition" or "Opp.," ECF 24), also with exhibits, and NASA

---

[1] Suit was originally filed in the District Court for the District of Columbia. *See* ECF 1. On August 21, 2013, Judge Royce C. Lamberth of that court ordered the transfer of the case to the District of Maryland. ECF 16. The transfer was effectuated on September 4, 2013. ECF 18.

The Complaint is 52 pages in length. It contains one count, titled: "Privacy Act violations."

[2] The Privacy Act contains a specific grant of subject matter jurisdiction to the federal district courts. *See* 5 U.S.C. § 552(a)(g)(1)(d).

replied, with exhibits. *See* ECF 25. No hearing is necessary is resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I will construe the Motion as a motion to dismiss, and I will grant the Motion. However, I will allow plaintiff to amend his Complaint to add factual support for some of his claims.

### Factual Summary[3]

On September 30, 1991, Hooker was hired by NASA as an oceanographer. Complaint ¶ 5. Since 2003, Hooker has held the civil service grade of GS-15. By August 16, 2010, Hooker served as Director of the Calibration and Validation Office, Ocean Ecology Laboratory, at the Goddard Space Flight Center ("GSFC") in Greenbelt, Maryland. *Id.* ¶¶ 6, 23. As of that time, Hooker had been employed by NASA for almost nineteen years and had never been denied a within-grade salary increase, never received a "needs improvement" performance appraisal, and had never been charged with employee misconduct. *Id.* ¶ 6.

On August 17, 2010, NASA began an investigation of Hooker due to allegations of sexual harassment lodged against him by three employees of Science Systems and Applications, Inc. ("SSAI"), a NASA contractor. *Id.* ¶ 7. NASA appointed Dr. Charles McClain, GSFC Ocean Ecology Branch Head, to conduct an investigation of the allegations against Hooker lodged by the three SSAI employees who had performed work for Hooker. *Id.*

Prior to interviewing Hooker, McClain requested that Winfield Decker, the Deputy Program Manager of SSAI, investigate whether Hooker was mentioned in the grant that supported SSAI contractor staff. *Id.* Decker informed McClain that Hooker was "not mentioned anywhere in the contractual language" of the grant. *Id.* Hooker alleges that McClain's request

---

[3] The facts are gleaned from the Complaint. As required, I have assumed the truth of the factual allegations and construed them in the light most favorable to plaintiff. *See, e.g.*, *Brockington v. Boykins*, 637 F.3d 503, 505–06 (4th Cir. 2011). However, because of the Complaint's length (52 pages), and its inclusion of numerous facts that do not bear on the disposition of the Motion, not all of its factual allegations are repeated herein.

"was an attempt to fish for or create contractual improprieties—where none had been established—and to link them to the sexual harassment allegations against Dr. Hooker." *Id.* And, Hooker alleges that the Decker's involvement violated the Privacy Act because Hooker had not yet been interviewed by NASA about the sexual harassment allegations. *Id.*

On August 23, 2010, McClain notified Hooker that he was under investigation. *Id.* ¶ 8. McClain advised that the investigation was triggered by allegations of sexual harassment made against Hooker in connection with Hooker's actions during a field campaign to the Arctic in June and July 2010. *Id.* ¶ 8. Hooker asked McClain to further explain the allegations made against him, but McClain declined to elaborate. *Id.* Hooker was also informed by McClain that he would be isolated from the SSAI employees with whom he worked and would no longer be permitted to see or talk to these SSAI employees. *Id.* Two days later, on August 25, 2010, Hooker contacted NASA Chief Counsel Robert Stephens to find out more about the allegations lodged against him and to determine his rights and responsibilities with respect to the investigation. *Id.* ¶ 9. Stephens informed Hooker that Hooker was alleged to have used "harsh language" with a coworker, but did not inform Hooker of his rights or his responsibilities. *Id.*

Robert Young, whom NASA appointed as Fact Finder in the investigation, interviewed Hooker on August 27, 2010. *Id.* ¶ 10. At the time of the interview, Young had already interviewed five SSAI employees who had worked with Hooker. *Id.* Young told Hooker that Hooker was being investigated for two inappropriate comments Hooker allegedly made in early July 2010 to Aimee Neeley, a SSAI employee. *Id.* According to Hooker, the allegations were, *id.*: (1) that Hooker made a comment indicating that Neeley's "butt crack" was showing; and (2) that Hooker used "a 'jerking-off' double entendre with [his] shipmates, one of whom was jerking on the body zipper of a dry suit worn by another, such that the other was jumping around like a

3

puppet on a string." Young questioned Hooker about these incidents. *Id.* In addition, Young questioned Hooker about "a stale incident from a year earlier that Dr. Hooker had already reported to management and for which NASA had not taken any timely discipline against Dr. Hooker." *Id.* (emphasis omitted).

On September 9, 2010, McClain informed Hooker that there would be a "broader inquiry" to the investigation. *Id.* ¶ 12. McClain sent an email to his colleagues on September 10, 2010, indicating that Hooker had not been informed about approximately 35 additional allegations of misconduct that had been lodged against him. *Id.* ¶ 14. On September 21, 2010, Dr. David Adamec, Hooker's supervisor, cancelled Hooker's trip "to support the mobilization for the GEOTRACES field campaign," which was scheduled for October 9, 2010. *Id.* ¶ 16. Instead, Dr. Joaquin Chaves, an SSAI contractor, was sent to represent Hooker at the GEOTRACES field campaign. *Id.* Chaves attended the GEOTRACES field campaign but, according to Hooker, collected data that was "of such low quality that it was scientifically useless for Dr. Hooker's areas of responsibility and scientific objectives." *Id.*

On September 21, 2010, McClain directed Decker to interview additional NASA contractors who had worked with Dr. Hooker, "thereby disclosing the allegations against Dr. Hooker and further damaging Dr. Hooker's professional reputation." *Id.* ¶ 17. Over the next few weeks, several other third parties were interviewed about Dr. Hooker's workplace behavior. *See id.* ¶¶ 17–22, 24–25.

On October 5, 2010, Young produced a Supplemental Report of Investigation. *Id.* ¶ 22. However, this document was not disclosed to Hooker until almost a year later. *Id.* A week after the Supplemental Report of Investigation was prepared, McClain notified Hooker by email that Hooker would be removed as Director of the Calibration and Validation Office and would be

replaced by McClain. *Id.* ¶ 23. On October 28, 2010, McClain resigned as the lead investigator into the allegations against Hooker and was replaced by Adamec. *Id.* ¶ 26. On November 8, 2010, Adamec informed Hooker that he would be denying Hooker his within-grade salary increase. *Id.* ¶ 30.

Adamec sent Hooker a document on December 2, 2010, detailing the allegations of misconduct lodged against Hooker and the discipline proposed as a result of these allegations ("Proposed Suspension"). *Id.* ¶ 32. The Proposed Suspension included thirty-seven allegations of misconduct committed by Hooker and proposed that Hooker be suspended for three days, without pay. *Id.* ¶ 33. At the time the Proposed Suspension was issued, Hooker had only been questioned about eight of the thirty-seven allegations included in the Proposed Suspension. *Id.* Hooker alleges that, over the next several months, he was removed from several projects, denied opportunities to work on others, and was again denied his within-grade salary increase. *See id.* ¶¶ 34–45.

On January 28, 2011, Hooker provided a written and an oral reply to the Proposed Suspension to the NASA Deciding Official, Dr. Dorothy Zukor. *Id.* ¶ 37. Hooker's attorney was present during the oral reply. *Id.* "In Dr. Hooker's original and subsequent sworn Declarations, he has specifically responded under penalty of perjury to each allegation of misconduct set forth in the Proposed Suspension, and directly rebutted and denied the vast majority of the allegations made against him." *Id.* Hooker acknowledges that he admitted to two of the allegations, although he does not specify the allegations to which admitted. Nevertheless, he claims that they both "have significant mitigating factors." *Id.*

Adamec notified Hooker on April 18, 2011, that he would receive a "Needs Improvement" performance appraisal for the 2010–2011 performance cycle. *Id.* ¶ 46.

Furthermore, on May 26, 2011, McClain informed Hooker that the Calibration and Validation Office would be moved to a new facility. *Id.* ¶ 49. As a result of the move, Hooker was told that his laboratory space would be significantly reduced. *Id.* On July 8, 2011, NASA, through its agents, delayed Hooker's ability to travel to Annapolis, Maryland in support of a field campaign in the Chesapeake Bay scheduled for later that month. *Id.* ¶ 51. Consequently, Hooker missed a portion of the field campaign. *Id.* According to Hooker, the reason NASA delayed Hooker's travel was to "entrap him in a violation of travel requirements." *Id.*

On August 10, 2011, Zukor upheld the Proposed Suspension. *See id.* ¶¶ 55–57. Subsequently, plaintiff filed a union grievance over Zukor's decision to impose the three-day suspension. *Id.* ¶¶ 57, 61. His grievance was denied in separate grievance appeal proceedings on September 22, 2011, and November 4, 2011. *Id.*

McClain notified Hooker on September 7, 2011, that he would be reintroduced into his "old workgroup" and that there would not be a formal reintroduction plan. Id. ¶ 54. McClain ignored Hooker's concerns about interacting with individuals who had harmed his career. *Id.* Moreover, McClain refused to reinstate Hooker as the director of the Calibration and Validation Office and refused to reinstate Hooker in several other leadership positions that Hooker held prior to the investigation. *Id.* A month later, on October 3, 2011, McClain informed Hooker that his participation would be limited at the annual NASA Ocean Color Research Team ("OCRT") meeting, the most important NASA meeting for Hooker's scientific community. *Id.* ¶ 58.

Hooker continues to be excluded from participating in research cruises with the rest of his workgroup because he remains forbidden from having any interaction with the SSAI employees who made allegations against him. *Id.* ¶ 63. Hooker's exclusion from these experiences allegedly deprives him the opportunity to collect valuable data for his research. *Id.* In addition,

Hooker continues to be prohibited from working on a proposal that he was awarded prior to the allegations being lodged against him. *Id.* ¶ 64. NASA also continues to exclude Hooker from participating in various teleconferences, from participating in annual OCRT meetings, and from using organization travel funds for official travel. *Id.* ¶¶ 64–73.

## Standard of Review[4]

A motion pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n.3 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In order to satisfy Rule 8(a)(2), a plaintiff need not include "detailed factual allegations." *Twombly*, 550 U.S. at 555. But, the rule demands more than bald accusations or mere speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual

---

[4] As noted, NASA has moved to dismiss or, in the alternative, for summary judgment. Because I grant NASA's motion to dismiss, I need not address the merits of NASA's arguments in support of summary judgment. *See In re Art Tech. Grp., Inc. Sec. Litig.*, 394 F. Supp. 2d 313, 319 (D. Mass. 2005) ("[Because] the Complaint does not survive the defendants' renewed motion to dismiss . . . , this court will not address the defendants' alternative grounds for summary judgment."); *cf. McKeel v. United States*, 178 F. Supp. 2d 493, 496 (D. Md. 2001) ("I shall grant the government's motion to dismiss; the motion for summary judgment is therefore moot."). And, because I have not considered the motion as a motion to dismiss, I have not considered the exhibits submitted by the parties. *See generally Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) ("Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a motion to dismiss.").

matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing such a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 992 (2010). However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Twombly*, 550 U.S. at 555. Similarly, the defendant's motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted). Moreover, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385–86.

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he or she seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or

sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201–02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

A motion asserting failure of the complaint to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "This principle only applies, however, if all facts necessary to the affirmative defense '*clearly appear*[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

**Discussion**

1.

Hooker alleges that NASA violated the Privacy Act, 5 U.S.C. § 552a(e)(2), a federal law that regulates "the collection, maintenance, use, and dissemination of information" about "individuals identified in information systems maintained by Federal agencies." *Doe v. Chao*, 540 U.S. 614, 618 (2004). In particular, Hooker contends that, during its investigation into the allegations of workplace impropriety lodged against Hooker, NASA failed to collect information

9

directly from him "to the greatest extent practicable," as required by 5 U.S.C. § 552a(e)(2). That section provides, *id.*:

> Each agency that maintains a system of records shall . . . collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits and privileges under Federal programs.

The Fourth Circuit has explained that 5 U.S.C. § 552a(e)(2) "attempts to strike a balance between the government's need to collect and maintain information and the privacy interests of the persons to whom such information pertains." *Hogan v. England*, 159 F. App'x 534, 536 (4th Cir. 2005). Similarly, the United States Court of Appeals for the District of Columbia has observed that the Privacy Act "supports the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government . . . , a principle designed to insure fairness in information collection which should be instituted wherever possible." *Waters v. Thornburgh*, 888 F.2d 870, 874–75 (D.C. Cir. 1989) (internal quotations omitted). However, the Privacy Act "does not require that an agency seek information *only* from a person it investigates[]; the Act allows agencies to question third parties where it would be impractical not to do so." *Hogan*, 159 F. App'x at 536 (emphasis in original).

Further, the Privacy Act provides that, whenever any agency fails to comply with 5 U.S.C. § 552a(e)(2) "in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency." 5 U.S.C. § 552a(g)(1)(D). To state a claim for relief for a violation of 5 U.S.C. § 552a(e)(2), a plaintiff must establish that: (1) the agency failed to elicit information directly from him "to the greatest extent practicable," 5 U.S.C. § 552a(e)(2); (2) the violation of 5 U.S.C. § 552a(e)(2) was "intentional or willful," 5 U.S.C. § 552a(g)(4); and (3) the action had an "adverse effect" on him, 5 U.S.C. § 552a(g)(1)(D). *See Waters*, 888 F.2d at 872; *Olivares v. Nat'l Aeronautics*, 882 F. Supp. 1545, 1549 (D. Md. 1995), *aff'd*, 103 F.3d 119

(4th Cir. 1996). The statute permits recovery of "actual damages sustained by the individual . . . , but in no case shall a person entitled to recovery receive less than the sum of $1,000; and the costs of the action together with reasonable attorney fees as determined by the court." 5 U.S.C. § 552a(g)(4).

Hooker's claim is based on two alleged flaws in NASA's investigation. First, Hooker alleges that NASA violated the Privacy Act because Young, NASA's investigator, questioned five SSAI employees about the investigation before Hooker was ever questioned. *See* Opp. at 17–18; Complaint ¶ 77. Second, Hooker argues that NASA violated the Privacy Act because, regardless of whether NASA was required to question Hooker *first* in its investigation, NASA failed to interview Hooker *at all* about a majority of the allegations lodged against him before imposing adverse effects upon him. *See* Opp. at 18–19; Complaint ¶¶ 78, 80. Hooker argues that, as a result of NASA's alleged violations of the Privacy Act, he suffered economic damages. *Id.* at 22. In particular, Hooker contends that due to NASA's failure to comply with the Privacy Act: (1) he lost the value of his within-grade salary increase; (2) he was given a needs-improvement performance appraisal, which caused him to lose a performance bonus; and (3) he experienced emotional distress, which caused him to spend money for medical treatment. *Id.*

NASA counters that the "Privacy Act did not require NASA to seek information from [Hooker] first before interviewing third parties." Motion at 14. Moreover, NASA contends that it complied with the Privacy Act's mandate "to collect information to the greatest extent practicable directly from" Hooker because Hooker (1) was interviewed by Young, NASA's investigator; (2) was afforded the opportunity to provide Zukor, the NASA Deciding Official, with a written and oral reply to the Proposed Suspension, with the assistance of counsel; and (3) was afforded the opportunity to file multiple grievances in which he could further explain his

11

version of events. *Id.* at 17. In addition, NASA maintains that Hooker's claim should be dismissed because, even if NASA violated the Privacy Act during its investigation into Hooker's workplace misconduct, NASA's violations of the Privacy Act did not impact the outcome of Hooker's investigation and were not "intentional or willful." *Id.* at 18–19.

2.

A.

As an initial matter, Hooker conceded in his Opposition "that any claim for injunctive and/or declaratory relief is not actionable." *See* Opp. at 16 n.5; *see also* 5 U.S.C. § 552a(g)(4); *Reinbold v. Evers*, 187 F.3d 348, 360 (4th Cir. 1999) ("While the Privacy Act permits an individual to contest the accuracy of the facts contained in an agency's administrative records, the Privacy Act does not permit an individual to force an agency to 'rewrite history, changing the record in Orwellian fashion to pretend that it reached some other conclusion.'" (citation omitted)). Therefore, I will grant the motion to dismiss as it pertains to Hooker's requests for injunctive and declaratory relief, including his request for a "clean record."[5]

B.

NASA's investigation of Hooker's alleged workplace misconduct did not violate the Privacy Act merely because Young, NASA's investigator, interviewed third parties before interviewing Hooker. The Fourth Circuit had an opportunity to address this precise issue in *Hogan*, *supra*, 159 F. App'x 534.

In *Hogan*, the Navy received allegations from several employees that a coworker, Harold Hogan, a Navy electrician, was intoxicated at work and behaved inappropriately toward

---

[5] NASA initially argued that Hooker's suit is "an impermissible collateral attack on the merits of an employment decision and should be dismissed." Motion at 21. However, after Hooker conceded in his Opposition that his claims for injunctive and declaratory relief were not actionable, ECF 24 at 16 n.5, NASA abandoned the argument, acknowledging that it "is no longer important with regards to the consideration of this motion." Reply at 14–15 n.6.

12

coworkers. *Id.* at 535. A Navy supervisor conducted an investigation into the allegations, during which he interviewed several of Hogan's coworkers prior to interviewing Hogan. *Id.* The resulting evidence of the investigation was presented to a high-ranking Navy official, who proposed that Hogan receive a fourteen-day suspension. *Id.* Hogan was then given an opportunity to respond to the allegations against him with the assistance of his union representative. *Id.* Subsequently, the Navy upheld the proposed suspension and suspended Hogan for fourteen days. *Id.* Hogan filed two unsuccessful union grievances. *Id.*

Thereafter, Hogan brought suit against the Navy in federal court. *Id.* He alleged that the Navy violated the Privacy Act "by interviewing third parties . . . for information that was available by directly interviewing Hogan." *Id.* At the conclusion of discovery, the Navy moved for summary judgment. Finding no violation of the Privacy Act, the district court granted the Navy's motion. *Id.* Hogan appealed to the Fourth Circuit, contending that the Navy violated 5 U.S.C. § 552a(e)(2) because, *inter alia*, it interviewed third parties before interviewing him. *Id.* Rejecting this contention, the Fourth Circuit observed, *id.* at 537 (citation omitted):

> Hogan also complains that the Navy did not interview him first. This fact, by itself, does not rise to the level of a Privacy Act violation. So long as the agency inevitably will need to interview both Hogan and others, the Act takes no position on the order in which they are approached. Indeed, one reasonably might argue that Hogan benefitted from being interviewed late in the process.

In addition, Hogan asserted that the Navy violated the Privacy Act by first interviewing third parties because he possessed objective proof that would have eliminated the need for any further questioning. *Id.* at 536. Again, the Fourth Circuit disagreed. It concluded that the Navy did not violate the Privacy Act by interviewing Hogan's coworkers during the investigation, because it "was confronted with entirely subjective allegations of intoxication and inappropriate conduct" and the testimony of Hogan's coworkers was the only evidence of his inappropriate

13

behavior. *Hogan*, 159 F. App'x at 536; *see also id.* ("[5 U.S.C.] § 552a(e)(2) does not prevent agencies from interviewing third parties when investigating subjective allegations of misconduct."). The Fourth Circuit noted that "most subjective accusations are 'incapable of being resolved by [the individual's] say-so'; hence, an accused's 'denial would not obviate the need to investigate allegations.'" *Id.* (quoting *Carton v. Reno,* 310 F.3d 108, 112 (2d Cir. 2002) (alteration in *Hogan*)). Consequently, the Fourth Circuit held that summary judgment was appropriately granted against Hogan. *Id.* at 537.

Applying the reasoning of *Hogan* to the instant case, I conclude that NASA did not commit a Privacy Act violation merely because it elected to interview third parties before interviewing Hooker. *Hogan* stands for the proposition that, during an investigation of one of its employees, an agency may elect to interview third parties before interviewing the subject of the investigation, so long as the agency inevitably will need to interview third parties during the investigation. *See id.* at 537. The Fourth Circuit concluded in *Hogan* that, inevitably, the Navy would have needed to interview third parties during its investigation of Hogan because (1) the allegations lodged against Hogan were "entirely subjective" in nature; and (2) the only evidence of Hogan's misconduct was the testimony of Hogan's coworkers. *See id.* 536–537.

Similarly, in the case at hand, NASA was confronted with "entirely subjective" allegations that Hooker made inappropriate comments to his coworkers. Significantly, like the agency in *Hogan*, NASA could not rely on objective evidence, such as video footage of the incidents in question, to eliminate the need to question Hooker's coworkers about Hooker's comments. Indeed, as was the case in *Hogan*, the only evidence that Hooker made inappropriate comments to his coworkers was the testimony of his coworkers. Thus, NASA inevitably would have needed to interview both Hooker and his coworkers during its investigation and,

consequently, NASA was free under the Privacy Act to interview Hooker's coworkers before interviewing Hooker. *See id.*; *see also Carton v. Reno*, 310 F.3d 108, 112 (2d Cir. 2002) ("[T]he complaint against Carton was incapable of being resolved by his say-so or by some documentation he might be expected to have."); *Cardamone v. Cohen*, 241 F.3d 520, 528 (6th Cir. 2001) ("[I]t is similarly impracticable to think that charges of employee mistreatment and harassment could be resolved by interviewing [plaintiff] before others."); *Wiatr v. Def. Fin. & Accounting Serv.*, Civ. No. 05-0765, 2008 WL 2704902, at *3 (N.D.N.Y. July 7, 2008) ("Due to the subjective nature of the charge, there was no reasonable possibility that plaintiff could have provided objective, unalterable information that would have ended the investigation."); *Thompson v. Dep't of State*, 400 F. Supp. 2d 1, 11 (D.D.C. 2005) (rejecting claim that Privacy Act was violated because subject of investigation was not interviewed first), *aff'd*, 210 F. App'x 5 (D.C. Cir. 2006).[6]

Accordingly, I will grant the motion to dismiss with regard to Hooker's claim that NASA violated the Privacy Act by interviewing his coworkers before interviewing him.

C.

Hooker's next contention is that NASA violated the Privacy Act because it did not interview him about a majority of the allegations lodged against him before imposing adverse effects upon him. *See* Opp. at 18 ("[S]urely the plain language of 5 U.S.C. § 552a(e)(2) . . . is certainly not complied with by failing to question the subject employee *at all* . . . about six (6) of the (8) specifications of misconduct subsequently charged in a proposed suspension . . . ."). To the extent Hooker bases his claim on NASA's failure to question him before issuing the *proposed* suspension, Hooker fails to state a claim for relief under the Privacy Act, because

---

[6] Indeed, it appears that Hooker abandoned this aspect of his claim in his Opposition. *See* Opp. at 18 ("[I]n sexual harassment-type investigations . . . the agency does not have to seek information first from the subject employee.").

15

Hooker admits that he had ample opportunity to contest those allegations before NASA made its *final* decision to actually impose discipline.

In particular, Hooker's Complaint reveals that he received a document detailing all thirty-seven allegations against him, *see* Complaint ¶¶ 32–33, and he provided, with the assistance of counsel, an oral and written reply in which he disputed those allegations. *See id.* ¶ 37. Hooker also admits that, after NASA imposed formal discipline against him, he was afforded the opportunity to file multiple grievances in which he could further explain his version of events. *See id.* ¶¶ 57, 61. This was more than sufficient to satisfy NASA's obligation under 5 U.S.C. § 552a(e)(2) "to collect information to the greatest extent practicable directly from" Hooker.

The Second Circuit reached the same conclusion in considering allegations similar to those made by Hooker. *See Carton*, *supra*, 310 F.3d at 109–112. In *Carton*, the plaintiff alleged that his employer violated the Privacy Act, in part because he was permitted to respond to allegations of misconduct only after receiving notice of a proposed suspension. The Second Circuit rejected his claim, holding that the Privacy Act was satisfied because "the [employer] elicited [plaintiff's] account of the disputed events before *imposing* discipline." *Id.* at 112 (emphasis added); *see also Gergick v. Austin*, Civ. No. 89–0838, 1992 WL 511848, at *19 (W. D. Mo. Aug. 24, 1992) ("The right of the employee to present his own case in writing and to refute the conclusions or information provided by others is adequate to meet the requirements of 5 U.S.C. § 552a(e)(2).")), *aff'd*, 997 F.2d 1237 (8th Cir. 1993).

The same is true here. NASA afforded Hooker the opportunity to provide his own account of all of the disputed events prior to imposing discipline. Thus, I will grant the motion to dismiss with regard to Hooker's claim that NASA violated the Privacy Act by failing to interview him about certain allegations prior to the proposed suspension.

D.

Hooker also avers that he is entitled to relief under the Privacy Act because, apart from the suspension, he suffered numerous adverse effects "***before*** he was given a right to reply by [NASA] and thereby provide an explanation or rebuttal." Opp. at 20 (emphasis in original); *see* Complaint ¶ 80. Specifically, Hooker asserts that, based on the allegations of misconduct, but before he was afforded a right to reply, he (1) "was excluded or removed from participation in a number of conferences, campaigns and proposals, in fields of study for which Dr. Hooker is an expert"; (2) was isolated from his working group; (3) was "denied a within-grade increase"; and (4) "was issued an unjustified 'Needs Improvement' performance appraisal which resulted in him receiving no performance award." Opp. at 20; *see* Complaint at ¶¶ 8, 16, 23, 39–42, 49–50. Accepting these well-pled allegations as true, as I must, I am still unpersuaded that Hooker has stated an actionable claim for relief.

As observed, to state an actionable claim under 5 U.S.C. § 552a(e)(2), Hooker must allege how NASA's failure to comply with that section resulted in an adverse effect on him. The focus of "the inquiry must be [on] whether the agency's compliance with subsection (e)(2) would have changed [the] outcome" of Hooker's disciplinary case. *Velikonja v. Mueller*, 362 F. Supp. 2d 1, 23 (D.D.C. 2004), *aff'd*, 466 F.3d 122 (D.C. Cir. 2006), *abrogated on other grounds*, *Doe v. Chao*, 540 U.S. 614, (2004). "It follows that the Court must consider whether [Hooker] would have been able to provide [NASA] with evidence the [allegations of misconduct were] in fact not true." In other words, Hooker must allege factual matter suggesting that NASA would not have imposed the adverse effects about which he complains if NASA had complied with the Privacy Act. *See Twombly*, *supra*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of

his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks and alteration omitted)).

Although Hooker's Complaint includes the conclusory assertion that, if he had been "properly informed, [he] would have been able to assist management and very likely reduce the discipline, damage, harm, and expense associated with the investigation," Complaint ¶ 15, he alleges no facts in support of that assertion. Indeed, on January 28, 2011, Hooker exercised his right to reply to the allegations against him and provided NASA with all of the information he had in his possession with respect to the investigation. Yet, NASA still concluded that Hooker committed misconduct. This conclusion was then affirmed twice in separate union grievance appeal proceedings. Hooker's Complaint does not identify a single piece of information he was unable to provide NASA in his response to the allegations of misconduct, nor does he explain why NASA's ultimate conclusions would have been any different if NASA had interviewed him about every allegation before visiting any adverse effects upon him.

After Hooker stated his case at these various levels of review, NASA continued to impose the very forms of discipline that Hooker now claims NASA would not have imposed if he had been allowed to state his case earlier. For example, the Complaint alleges that NASA continues to "isolat[e] Dr. Hooker from his scientific community," Complaint ¶ 58; prohibit him from working on certain projects, *id.* ¶ 64; and "exclude[] [him] from using the Calibration Laboratory," *id.* ¶ 68. In light of all of this, the Complaint provides no plausible factual basis to believe that Hooker "would not have received the same discipline or personnel actions even if [NASA] conducted the investigation exactly the way Plaintiff thought it should have been done." Reply at 11. Therefore, to the extent NASA violated the Privacy Act by imposing adverse consequences on Hooker before he had an opportunity to respond to the allegations of

18

misconduct, Hooker has failed to plausibly allege that any violation changed the outcome of his disciplinary case. As a result, he has not stated an actionable claim for relief under the Privacy Act.

Plaintiff filed a voluminous Complaint. Nevertheless, I will grant him leave to amend the Complaint to add factual support to his assertion that, absent defendant's alleged violations of the Privacy Act, he would not have suffered the adverse effects that were imposed upon him prior to January 28, 2011—the date on which he was permitted to provide an oral and written reply to Dr. Zukor.

## Conclusion

For the foregoing reasons, the Court will grant the Motion, with leave to amend. A separate Order follows.


Date: April 24, 2014                     /s/
                                         Ellen Lipton Hollander
                                         United States District Judge